Joseph R. Saveri (*pro hac vice* pending)
Cadio Zirpoli (*pro hac vice* pending)
David H. Seidel (*pro hac vice* pending)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                czirpoli@saverilawfirm.com
                dseidel@saverilawfirm.com

Christopher J. Hydal (SBN 5670492)
**JOSEPH SAVERI LAW FIRM, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone:     (646) 527-7310
Facsimile:     (212) 202-7678
Email:          chydal@saverilawfirm.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTOINETTE JENKINS, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>VISA, INC.,<br><br>                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

NATURE OF THE CASE ........................................................................................... 1

JURISDICTION, VENUE, AND COMMERCE .......................................................... 6

PARTIES .................................................................................................................... 7

FACTUAL BACKGROUND FOR CLAIMS ............................................................... 8

   I.   Debit Transactions ........................................................................................... 8

      A.   Overview of Debit Transactions .............................................................. 9

      B.   Debit Networks ...................................................................................... 12

      C.   Debit Network Fees ............................................................................... 13

      D.   How Visa Came to Dominate the Debit Network Market ....................... 13

      E.   Visa Faces No Meaningful Competition from PIN Networks ................. 14

      F.   Alternative Debit Networks ................................................................... 16

   II.   Visa Monopolizes the Debit Network Market in the United States and Harms
       Consumers through Exclusionary, Anticompetitive, and Unlawful Conduct ................. 16

      A.   Visa Has Been the Dominant Debit Network Provider for Over a Decade ................. 16

      B.   Visa Enters Contracts with Banks and Merchants to Hinder Competition ................. 18

      C.   Visa Leverages its Monopoly Power to Foreclose Innovative Alternative Networks .. 25

   III.   Anticompetitive Effects ................................................................................. 30

   IV.   No Countervailing Factors ............................................................................ 32

   V.   Relevant U.S. Debit Markets ........................................................................ 33

      A.   The United States is a Relevant Geographic Market .............................. 33

      B.   Relevant Product Markets ...................................................................... 33

   VI.   Visa Has Monopoly Power in the U.S. Debit Markets ................................... 36

   VII.  Class Allegations .......................................................................................... 39

CAUSES OF ACTION .............................................................................................. 40

RELIEF SOUGHT .................................................................................................... 45

DEMAND FOR JURY TRIAL .................................................................................. 46

Plaintiff Antoinette Jenkins, on behalf of herself and on behalf of all those similarly situated, alleges as follows:

## INTRODUCTION

1. Debit cards have become Americans' primary non-cash payment method, processing over $4 trillion in transactions in 2021 – double the 2015 volume. These transactions rely on debit networks, technological infrastructure that enables real-time payment processing between buyers and sellers, with networks charging merchants fees that are typically passed on to consumers.

2. Visa dominates this market through anticompetitive practices designed to maintain its market power and supracompetitive pricing. Controlling over 60% of debit transactions, Visa collects more than $7 billion in annual fees from its U.S. debit business—its largest revenue source globally—while maintaining an 83% profit margin on network processing fees.

3. Visa maintains this position through three key strategies:

- Leveraging its scale and monopoly position to penalize merchants and issuing banks who attempt to route transactions through lower-cost alternative networks.

- Using payments and anticompetitive agreements to prevent potential competitors from developing rival networks.

- Creating barriers that prevent competitors from achieving the scale necessary to compete effectively.

4. Internal Department of Justice documents reveal Visa's explicit concern about having to compete on price, leading to its strategy of using anticompetitive tactics to protect its market position and profitability. These practices force merchants to accept Visa's premium pricing, costs which are ultimately passed to consumers through higher prices for goods and services.

5. This lawsuit seeks to end Visa's anticompetitive practices, secure compensation to consumers, and restore genuine competition and innovation to the debit network market.

## NATURE OF THE CASE

6. Plaintiff and members of the proposed class use their debit cards to buy goods and services from merchants. Debit card transactions continue to increase in popularity, accounting for a growing number of consumer purchases every year. Consumers can purchase their goods and

CLASS ACTION COMPLAINT

services in-person at brick-and-mortar stores ("card-present" or "CP" transactions) or online ("card-not-present" or "CNP" transactions).

7. When a consumer uses his or her debit card to make a purchase from a merchant, the merchant's bank ("acquiring bank" or "acquirer") contacts the consumer's bank ("issuing bank" or "issuer") to transfer the funds from the consumer's bank account to the merchant's bank account. This communication and transfer of funds between the banks is completed on a debit network. Issuing banks decide the networks they will place on their debit cards, while merchants and acquirers decide the networks from whom they will accept debit card payments. For the transaction to work, that is, for the consumers to be able to purchase goods or services with their debit cards, both the issuing bank and the merchant bank must be a part of or use the same network.

8. Not all issuing banks, merchants, and acquiring banks use the same networks. Thus, it is not always the case that a consumer will be able to use his debit card for every transaction. Whether a network is used by an issuing bank, merchant, or acquiring bank is largely dependent on scale on both sides of the market. Substantial network effects are thus present.

9. An issuing bank will only place a network on its debit cards if sufficient acquiring banks and merchants accept the network. Meanwhile, merchants and acquiring banks will only join a debit network if sufficient issuing banks select the debit network on their debit cards. Simply put, an aspiring debit network provider faces a classic chicken-and-egg problem, where success is contingent on gaining adequate scale on both sides of the transaction. This barrier to entry protects debit networks like Visa from competition.

10. Visa has been the largest debit network in the United States for decades, processing over 60% of all debit transactions in the United States, and over 65% of all card-not-present transactions. The next largest debit network, Mastercard, processes less than 25% of all debit transactions and card-not-present debit transactions in the United States. The remaining debit network providers, primarily PIN networks, each make up only a fraction of the remaining debit network transactions.

11. Visa's dominant market share is the product of intentional and calculated anticompetitive steps taken by the company to limit competition and retain its monopoly power.

12. Following the Great Recession, Visa identified two significant threats to its monopoly. Congress's passing of the Durbin Amendment in 2010 was the first threat. The Durbin Amendment was passed as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 124 Stat. 1376 (2010), with the goal of promoting competition in the debit network industry and providing additional network choices to merchants and acquirers. Specifically, the Durbin Amendment requires issuing banks to include at least two unaffiliated debit networks on every debit card—one on the front of the card and at least one on the back of the card. These networks are aptly referred to as "front-of-card" and "back-of-card" networks.

13. Unaffiliated networks on debit cards would threaten Visa's dominance and monopoly power in the market. If more debit networks were available, Visa's competitors could gain the scale needed to compete, thereby causing Visa to lose volume and fees. Indeed, this was the initial impact of the Durbin Amendment; after it became effective in 2012, Visa initially lost volume to other debit networks that offered lower fees. If this trend had continued, Visa would have lost its market dominance. To counteract these effects, Visa leveraged its power in the market to limit competition and retain its dominance.

14. For a significant number of transactions, Visa is the only network available to connect the consumer's issuing bank to the merchant and acquiring bank. For these transactions, known as "non-contestable" transactions, Visa does not face any meaningful competition and can accordingly threaten merchants and acquiring banks with high rates they must accept if they wish to complete these transactions.

15. For the rest of the transactions, known as "contestable" transactions, there is more than one network available to complete the transaction between the parties. In a free and fair competitive market, contestable transactions should result in lower fees and innovation to win business. Visa, however, uses its market power over non-contestable transactions to prevent competition.

16. Visa's significant number of non-contestable transactions gives it leverage over merchants and acquirers to enter into routing agreements. Absent a routing agreement, the merchant or acquirer pays a list price (also known as a the "rack rate") on each transaction completed on Visa's debit network. However, with a routing agreement, the merchant or acquirer receives a purported

discount on its Visa transactions in exchange for committing a meaningful share of all transactions, contestable and non-contestable, to Visa's debit network. In this way, Visa imposes punitive rack rates if merchants or acquirers route too many of their contestable transactions to Visa's competition. As a result, merchants and acquirers must choose between signing agreements that require routing the majority of all transactions to Visa, or paying punitive rack rates. Since Visa is only network for a substantial number of non-contestable transactions, Merchants are effectively forced to sign agreements that ensure Visa remains the dominant debit network.

17. Through these agreements, pricing strategies and other anticompetitive conduct, Visa's competition is foreclosed from achieving adequate scale and meaningfully competing.

18. Visa's routing agreements ensure it is protected from facing meaningful competition. Visa's routing contracts cover more than 180 of its largest merchants and acquirers, insulating at least 75% of Visa's debit card transactions from competition and foreclosing nearly half of total U.S. debit card volume. Visa internally touts the success of its routing agreements at subverting competition. Visa renewed many of its routing agreements in 2022, thereby ensuring it retains its dominance in the market for years to come.

19. The second threat to Visa's monopoly power was emerging technologies and innovation that could provide more efficient alternatives to the services Visa provides. In addition to frustrating the purpose of the Durbin Amendment, Visa took steps to ensure newer technologies cannot meaningfully compete for market power.

20. Several digital platforms, such as Apple Pay, PayPal, Cash App, and Square provide consumers and merchants an alternative to debit networks, whereby consumers can link their debit card credentials to the product. These digital platforms have been steadily gaining large networks and popularity among consumers and merchants alike.

21. Given the rising popularity of digital platform innovations, Visa worried these companies might gain market power and attempt to dethrone Visa's dominant market position. Visa identified these digital platform companies and their technologies as a substantial threat to its business.

22. To prevent these innovative digital platform companies from becoming actual competitors that might threaten Visa's market power, Visa entered into agreements with these companies to

avoid competition before they had the chance to compete. For example, Visa offers lucrative incentives, sometimes worth hundreds of millions of dollars annually, to potential competitors on the express agreement they will not develop a competing product or otherwise act in ways that could threaten Visa's dominance.

23. Visa has also threatened potential competitors with additional and punitive fees if they develop competing products.

24. Visa's anticompetitive conduct has harmed merchants and consumers in the relevant market in at least three ways.

25. First, in conjunction with the high barriers to entry, Visa exercises its monopoly power in the debit market to harm competition by depriving the market of the scale necessary to compete, by, for example, entering into agreements that punish merchants for utilizing competitor debit networks to process their transactions. Because Visa-branded cards comprise a substantial portion of all U.S. debit cards and comprise a large portion of merchants' non-contestable transactions, Visa can engage in the above anticompetitive conduct and charge supracompetitive rates without losing business.

26. Second, Visa's conduct diminishes competition in a substantial portion of the relevant debit market, including at least 45% of all U.S. debit transactions and over 55% of card-not-present transactions. As a result, Visa's would-be competition is handicapped and unable to gain the scale necessary to compete on price and quality because a network must be carried by both sides of the transaction for the network to own the transaction. Visa's agreements with issuers, merchants, and acquirers prevent competitors from gaining scale and competing.

27. Third, Visa secured agreements from several large, would-be competitors to not release innovative or new technologies that could serve as alternatives to Visa's services. These agreements, including with Apple, PayPal, and Square, have turned potential competitors into partners who share in Visa's monopoly profits.

28. Without meaningful competition, Visa is able to charge supracompetitive fees on virtually every Visa debit transaction.

CLASS ACTION COMPLAINT

29. Visa enjoys supracompetitive profits that it would not be able to maintain but-for its anticompetitive and unlawful conduct. These high fees are one of the largest costs merchants face. To stay in business, merchants pass-on these fees to consumers, who ultimately pay Visa's excessive fees and bear the brunt of the market's lack of competition.

30. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, alleging violations of Sections 1 and 2 of the Sherman Act and various state antitrust and consumer protection laws.

31. Plaintiffs seek to put a stop to Visa's unlawful and anticompetitive conduct and remedy the harm Visa has caused.

**JURISDICTION, VENUE, AND COMMERCE**

32. This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of Visa.

33. The Court also has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a) because Plaintiff seeks injunctive relief under the Sherman Act, 15 U.S.C. § 1 & 2. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

34. This Court also has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

35. This Court has personal jurisdiction over Visa because it purposefully directed its business activities towards this jurisdiction, had substantial contacts with this jurisdiction, and because Plaintiff's claims for relief arise from and relate to illegal acts committed within this jurisdiction.

36. Visa's activities were within the flow of and were intended to and did have a substantial effect on the interstate commerce of the United States. Visa's services are sold in the flow of interstate commerce.

37. By reason of the unlawful activities alleged herein, Visa's unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and the geographically

1  dispersed class members. Visa, directly and through their agents, engaged in activities affecting

2  all states.

3  38. Plaintiff seeks injunctive relief, compensatory damages, all damages available under

4  applicable statutes, costs, and reasonable attorneys' fees.

5  39. Venue is proper in this Direct under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c),

6  and (d) because at all times relevant to the Complaint: (a) Visa transacted business, were found, or

7  acted through subsidiaries or agents present in this District; (b) a substantial part of the events

8  giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected

9  interstate trade and commerce has been carried out in this district. Among other conduct, Visa

10 provided network services for transactions conducted in this District and entered into agreements

11 with merchants and/or acquiring banks in this District.

12 40. During the relevant period, Visa engaged in anticompetitive conduct in the United States

13 that was purposefully directed at the United States and was specifically intended to impact the

14 competition, prices, and overall debit networks that Plaintiff, Class Members, merchants, and

15 acquiring banks use to complete transactions for goods and services.

16 41. Visa's illegal conduct was directed at and had the intended effect of causing injury to

17 persons residing in the United States, including in this District. Accordingly, this Court has

18 jurisdiction over this cause of action, and venue is proper.

19 ## PARTIES

20 42. Plaintiff Antoinette Jenkins is a corporate wellness manager and an individual and citizen

21 of California. Plaintiff Jenkins uses debit cards from Chase Bank and from Chime that have Visa

22 designated as the font-of-card network. Plaintiff's primary method of paying for goods or services

23 is with her Visa debit cards, and she has consistently made purchases with these cards for personal,

24 family, and/or household purposes for at least the past five years. Plaintiff also uses her Visa debit

25 cards for online purchases as well. On average, Plaintiff uses her Visa debit card to purchase

26 thousands of dollars of goods and services for personal, family, and/or household purposes, per

27 year.

28

CLASS ACTION COMPLAINT

43. Defendant Visa, Inc. is a Delaware company with its principal place of business in San Francisco, California. Visa owns and operates the Visa debit network, the largest debit network in the United States. Last year, Visa routed 57.6 billion debit transactions worth $2.8 trillion. Visa provides a two-sided transaction platform that processed debit transactions between merchants, consumers, and banks through authorization, clearance, and settlement. In fiscal year 2023, Visa reported approximately $32.7 billion in revenues, including $14 billion in the United States. Visa engages in interstate trade and commerce, and its activities substantially affect trade and commerce. Visa's services are marketed, distributed, and offered through the United States, including across state lines and in this District.

**FACTUAL BACKGROUND FOR CLAIMS**

**I.    Debit Transactions**

44. Debit transactions represent a fundamental form of financial exchange where funds are drawn directly from a consumer's bank account to pay for goods or services. This immediate withdrawal system allows consumers to make purchases at retailers, pay bills online, and access their funds through automated teller machines (ATMs), providing a direct link between their bank accounts and their daily financial needs.

45. The history of debit transactions in the United States traces back to the 1960s, when banks began innovating ways for customers to access their funds more efficiently. Initially, debit cards were primarily used for ATM withdrawals, but their functionality gradually expanded to support retail purchases. By the 1990s, debit cards gained widespread adoption as merchant acceptance grew and consumers sought more convenient alternatives to cash and checks.

46. Today, debit transactions have become an integral part of the U.S. financial system, distinguished by their unique characteristic of immediately authorizing fund deductions from a consumer's bank account balance.

47. This payment method has achieved remarkable popularity despite the fact that account holders rarely earn rewards when using their debit cards, unlike credit card users who often receive various incentives and benefits.

48. The preference for debit transactions spans a diverse range of consumers, including those who cannot obtain or choose not to use credit cards, individuals with limited credit availability, and people who deliberately avoid the lending dynamics associated with credit cards. Many consumers appreciate debit transactions because they help prevent debt accumulation, eliminate the risk of credit card fees and interest charges, and enforce spending discipline by limiting purchases to available funds. Additionally, the convenience of debit transactions compared to cash and checks has made them an essential tool for millions of Americans conducting both online and in-person purchases.

**A.    Overview of Debit Transactions**

49. Debit is a payment method that enables consumers to purchase goods and services from merchants using a number directly linked to their bank accounts.

50. These transactions are facilitated by debit networks, which provide the technological and communications infrastructure necessary for secure, real-time payments between businesses, merchants, and consumers' bank accounts.

51. In the United States, consumers typically make debit purchases using "general purpose" debit cards issued by their banks, that can be accepted at numerous, unrelated merchants.

52. Debit networks like Visa do not directly issue cards to account holders. Instead, they contract with consumers' banks (known as issuing banks or issuers) to issue the debit cards, and with merchants' banks (known as acquiring banks or acquirers) to enable merchant acceptance. The network's product includes a unique debit credential, payment guarantees for merchants, dispute and chargeback capabilities, fraud protections, and the "rail" through which banks communicate to facilitate transactions and fund transfers.

53. Debit card credentials consist of several key components: a 16-digit card number, expiration date, card verification value (CVV), EMV security chip, and a four-digit PIN.

54. Cards typically display both "front-of-card" and "back-of-card" networks, though few include more than two unaffiliated networks.

55. While merchants theoretically have a choice between using the front-of-card network (which is Visa for approximately 70% of debit card payment volume) or a back-of-card network,

this choice is illusory as the merchant's routing decision defaults to Visa due to Visa's exclusionary and anticompetitive conduct (which is discussed more fully in subsequent sections).

56. Figure 1 shows the debit card credentials and networks.

**Figure 1:**




57. The transaction process begins when a consumer presents their debit credentials to a merchant. The merchant's bank sends the account and transaction information to the debit network for processing, which then requests authorization from the consumer's bank. If approved, the issuer places a hold on the consumer's funds and returns an authorization response through the network to the acquirer, minus the interchange fee. The acquirer then notifies the merchant to complete the transaction, with the entire process typically taking just seconds.

58. While banks ultimately move money from consumers to merchants, debit networks play a crucial role in clearing and overseeing the settlement process. They aggregate daily transactions for each bank, net out applicable fees, and provide settlement reports that banks use to transfer funds among themselves via wire services. Networks also establish transaction rules, with large networks like Visa wielding significant influence over industry practices.

59. Most consumers remain unaware of how funds are allocated among the various participants in these transactions, including merchants, debit networks, processors, and financial institutions.

60. Figures 2 and 3 below provide a graphical representation of the transaction:

**Figure 2**[1]



**Figure 3**[2]



---

[1] https://community.developer.visa.com/t5/Tutorials/A-Detailed-Look-at-the-Payments-Ecosystem-from-Visa-Payment/ba-p/7463.
[2] https://www.mastercard.com.au/en-au/business/merchants/start-accepting/payment-process.html.

1    61. Debit transactions can be either card-present (in-person) or card-not-present (online or in-

2    app).

3    62. Card-not-present transactions now comprise about half of all debit spending, a significant

4    increase since 2010, and continue to grow. These transactions typically rely on stored credentials

5    in digital wallets like Google Pay, Apple Pay, or PayPal, and employ security features such as

6    multi-factor authentication rather than PIN entry.

7    **B.    Debit Networks**

8    63. Every debit card is required to include a minimum of two distinct debit networks: a primary

9    front-of-card network and at least one independent back-of-card network that has no affiliation

10    with the front-of-card network. The banks that issue these cards have the authority to determine

11    which front-of-card network to use and can decide both the number and selection of back-of-card

12    networks to enable. While the front-of-card network's brand typically appears prominently on the

13    card itself, the logos of back-of-card networks are frequently omitted from the physical card

14    design.

15    64. Consumers don't typically choose their debit networks—this is determined by their choice

16    of bank. Visa dominates as the front-of-card network, followed distantly by Mastercard, with

17    smaller networks making up the rest. As a result, most consumers end up with Visa as their front-

18    of-card network regardless of which bank they choose.

19    65. Visa debit cards (i.e., debit cards including Visa as the front-of-card network) typically

20    include Interlink as a back-of-card network. Interlink is a Visa affiliated back-of-card network.

21    Thus, most Visa debit cards have three networks: Visa on the front, its affiliated network Interlink

22    on the back, and one unaffiliated back-of-card network. These unaffiliated networks are typically

23    smaller PIN networks–named after their origins in ATM machines where customers needed to

24    enter PIN numbers for cash withdrawals.

25    66. Issuing banks control which back-of-card networks can process transactions. Although PIN

26    networks are included on most debit cards, they handle very few transactions, primarily due to

27    Visa's anticompetitive and unlawful practices.

28    67. Visa has secured long-term contracts with most issuing banks.

68. Switching to a different front-of-card network is costly, especially since it requires issuing new debit cards to all customers.

69. This means Visa faces minimal competition from other networks for its existing bank relationships.

**C.    Debit Network Fees**

70. Consumers don't directly pay debit networks like Visa for their services. Instead, these networks generate revenue by charging fees to both issuing and acquiring banks on every debit transaction.

71. Acquiring banks face two categories of charges: transaction-based and fixed fees.

72. For each Visa transaction, acquiring banks pay a "network" fee that varies based on whether the purchase is made in-person or online. Since 2012, they've also paid a monthly "Fixed Acquirer Network Fee" (FANF), which varies according to merchant size and transaction volume. Additionally, acquiring banks must pay "Interchange Fees" to issuing banks.

73. For large issuing banks (those with assets over $10 billion), these Interchange Fees are capped by the Federal Reserve, while for smaller banks, the debit network sets the rate. Generally, PIN networks charge lower fees than Visa.

74. The fees imposed become substantial for merchants who process hundreds, thousands, or millions of transactions.

75. While merchants typically bear these fees and pay additional charges to their acquiring banks, they offset these costs by raising prices on goods and services. This means that although consumers don't pay debit networks directly, they ultimately shoulder these transaction costs indirectly through higher prices.

**D.    How Visa Came to Dominate the Debit Network Market**

76. The modern debit system originated in the late 1960s with ATMs and point of sale (POS) systems–essentially cash machines that let customers withdraw money using a 4-digit PIN. At this time, Visa (then called BankAmericard) was a Bank of America joint venture already established in credit cards. The company rebranded as Visa in the 1970s and launched its first debit cards, coinciding with merchants' growing adoption of POS systems as a faster alternative to checks.

77. Visa leveraged its existing credit card relationships and infrastructure to rapidly expand its debit business. The company required merchants to accept both its credit and debit cards, and maintained exclusive relationships with issuing banks until the early 2000s, preventing these banks from issuing competitors' cards like American Express or Discover.[3]

78. The 1990s saw Visa introduce a signature-based debit card that used its credit card networks rather than requiring PINs. While debit transactions had previously been fee-free, Visa began charging substantial fees–around $1.35 per $100 purchase – higher than its competitors' minimal fees in PIN networks. Despite higher costs, Visa used this strategy to gain market dominance, sharing these high profits with banks in exchange for issuing its cards.

79. Between 2006 and 2008, both Visa and Mastercard separated from their banks and went public. Although banks could theoretically issue both networks' cards, most chose one. The high costs of switching networks meant banks rarely changed providers, limiting competition.

80. This changed in 2012 with the Durbin Amendment, which required cards to include at least one unaffiliated back-of-card network and capped interchange fees for large banks (over $10 billion in assets). For smaller banks, networks like Visa still set these fees.

81. Despite some regulatory changes, Visa remains the dominant debit network today, controlling over 70% of U.S. debit card transactions as the front-of-card network in the United States. Mastercard is a distant second at 25%.

**E.    Visa Faces No Meaningful Competition from PIN Networks**

82. For debit networks to achieve scale and meaningfully compete, they need simultaneous adoption from both issuing and acquiring sides. Issuing banks hesitate to enable networks that lack widespread merchant acceptance, while acquiring banks and merchants are reluctant to accept networks that aren't widely enabled by issuers. This creates a self-reinforcing cycle known as "network effects."

---

[3] A 2003 opinion from the United States Court of Appeals for the Second Circuit put an end to this practice, holding that the exclusivity relationships were anticompetitive and illegal. Settlements stemming from this decision included an agreement to allow merchants to accept its debit cards without accepting credit cards, and vice versa.

83. For any given transaction, all parties involved (issuing bank, acquiring bank, and merchant) must have enabled a specific debit network for it to process that transaction. This means that even when a debit network is present on a consumer's card, it may not actually handle any transactions.

84. Visa has largely bypassed these network effect challenges, having achieved massive scale early through its signature network and its historical connections as a Bank of America-affiliated credit card network. Their dominant market position and long-term issuer agreements create nearly insurmountable barriers for smaller, competing PIN debit networks.

85. However, technological innovations have created new opportunities for Visa's would-be competitors. PIN networks can now process PIN-less transactions, allowing them to handle both card-not-present transactions and in-person transactions without requiring consumers to enter a PIN.

86. To stifle the competitive impact of these innovations, Visa implements rules and terms requiring merchants and acquirers to route most transactions through their network rather than alternative back-of-card networks. This practice effectively limits competition, particularly from smaller PIN networks, who can only compete for a small portion of debit transactions. This artificially restricts routing options and shields Visa from meaningful competition.

87. Visa's ability to enforce these terms stems from its market dominance and the existence of "non-contestable" transactions—those that must be processed through Visa because back-of-card networks cannot handle them. These include transactions exceeding certain dollar amounts or requiring specific encryption criteria. For example, card-present transactions become non-contestable when the issuing bank prohibits PIN-less processing and no PIN is entered, either because the merchant didn't prompt for one or the consumer chose not to enter it.

88. In the card-not-present space, non-contestable transactions occur when payments aren't tokenized (where tokenization refers to replacing the 16-digit card number with a unique alternate number).

89. In 2023, alternative debit networks processed only a minimal share of card-not-present tokenized transactions.

90. These non-contestable transactions constitute the majority of Visa debit card volume, largely due to network effects. Historically, issuing banks—sometimes at Visa's urging—typically did not enable card-not-present PIN-less transactions, which in turn discouraged merchants and acquiring banks from supporting this capability.

91. Given Visa's market dominance, merchants face a stark choice: accept Visa's terms and conditions or lose substantial business. Consequently, almost all merchants route a substantial volume of their transactions through Visa instead of alternative, often less expensive, back-of-card networks.

**F.      Alternative Debit Networks**

92. Alternative debit payment solutions, particularly those developed by financial technology companies ("fintech debit"), offer options beyond traditional debit networks.

93. These fintech debit solutions can replicate the complete functionality of traditional debit networks. They can authorize payments with issuing banks, manage the communication flow for authorization and clearing, and handle settlement by facilitating payments to acquiring banks. They can also leverage more cost-effective money transfer systems available to banks, such as the Automated Clearing House ("ACH") or Real Time Payment ("RTP") networks, which offer significant savings compared to Visa's debit network fees.

94. This potential for disruption has not gone unnoticed by Visa. The company recognizes and fears that these alternative debit networks could threaten its market dominance, as they can match Visa's core functionality—including merchant payment credentials, payment guarantees, dispute resolution, chargeback capabilities, and fraud protection—while operating at lower costs.

**II.      Visa Monopolizes the Debit Network Market in the United States and Harms Consumers through Exclusionary, Anticompetitive, and Unlawful Conduct**

**A.      Visa Has Been the Dominant Debit Network Provider for Over a Decade**

95. Visa stands as one of America's most profitable corporations, generating global operating income of $18.8 billion with a remarkable 64% operating margin in 2022. The company's North American operations are exceptionally lucrative, achieving an 83% operating margin that year.

96. Within Visa's global portfolio, its U.S. debit business generates the largest revenue stream. The company collects over $7 billion in annual network fees from U.S. debit volume, resulting in $5.6 billion in net revenue. In 2022, this U.S. debit business outperformed both Visa's domestic credit operations and its debit businesses in all other global regions.

97. A key factor in Visa's profitability is its negligible transaction costs. As noted by Visa's former CFO, processing additional transactions adds "approximately zero" incremental cost. Furthermore, Visa bears no financial exposure to fraud. When fraudulent purchases occur using stolen debit cards, the financial burden falls entirely on merchants or issuers.

98. Visa's market dominance has remained remarkably stable despite significant industry changes, including regulatory reforms, the surge in e-commerce and mobile payments, and new technological innovations. Even as the underlying product becomes "increasingly viewed as a commodity," Visa continues to process over 60% of all debit transactions and 65% of card-not-present debit transactions in the United States, while maintaining higher fees than competitors. The company's front-of-card presence appears on over 70% of U.S. debit card payment volume – nearly triple that of Mastercard, its closest competitor at 25%. No other rival captures more than a single-digit share of front-of-card debit volume, leading Visa's former Head of Product North America to acknowledge the company's "dominance on the front of card."

99. Visa's fee structure typically imposes lower charges on issuers compared to acquirers, with issuers often receiving preferential rates in exchange for actions that benefit Visa's market position.

100. The company maintains its monopolistic position through two primary strategies.

101. First, it prevents competitors from achieving competitive scale by controlling both sides of the debit market: merchants and issuing banks. Visa secures merchant and acquirer volume through *de facto* exclusive deals that effectively mandate exclusive routing. For issuers, Visa provides financial incentives to discourage actions that would benefit rival PIN networks, such as enabling PIN-less routing. Broader issuer enablement would weaken Visa's market leverage, make more transactions contestable by competing PIN networks, and potentially trigger widespread merchant adoption.

102. Second, Visa stifles potential competition from digital platforms by requiring or inducing them to avoid developing innovative alternatives to Visa's traditional card-based debit infrastructure. These arrangements are enforced through substantial penalties for non-compliance, effectively ensuring that merchants, acquirers, issuers, and digital platforms overwhelmingly accept Visa's terms.

**B.    Visa Enters Contracts with Banks and Merchants to Foreclose Competition**

103. Visa's market dominance stems from a deliberate strategy to control debit transaction volume and prevent point-of-sale competition, rather than from historical accident or competitive merit. This approach specifically targets two perceived threats: smaller debit networks (particularly PIN networks) and regulatory measures designed to increase competition.

104. The 2012 Durbin Amendment posed a significant regulatory challenge to Visa's position by requiring debit cards to support at least two unaffiliated networks, aiming to increase competition in a historically restricted market. Visa's internal documents reveal its recognition that PIN networks and outspoken merchants would leverage this legislation to redirect volume away from Visa, necessitating quick and decisive action.

105. Visa countered this threat by exploiting a crucial market reality: despite the Durbin Amendment's dual-network requirement, many transactions remain "non-contestable"—approximately 45% of card-present transactions and an even higher percentage of card-not-present transactions can only be processed through Visa's network given current market realities. This captive volume provides the company leverage to demand and enforce volume commitments and other exclusive dealings.

106. Visa employs a two-pronged approach to secure these commitments: sharing monopoly profits to purchase exclusivity, while simultaneously imposing punitive pricing and harsh penalties on those who either refuse routing agreements or fail to meet exclusivity requirements. These increased fees bear no relation to Visa's actual transaction costs.

**1.    Visa Imposes Anticompetitive Contracts on Merchants and Acquiring Banks**

107. Visa employs a sophisticated anticompetitive pricing and penalty strategy to maintain control over debit transaction routing. Most merchants face substantial financial penalties unless

they route nearly all eligible transactions through Visa, effectively foreclosing PIN networks' ability to compete and frustrating the Durbin Amendment's objectives.

108. Visa implements this strategy through direct contracts with large merchants and acquiring banks that control the routing decisions for merchants that do not have a direct agreement with Visa, using a combination of incentives and penalties. These contracts typically require granting Visa preferred position on routing tables and volume commitments, with harsh consequences for non-compliance.

109. Visa also shares monopoly profits for exclusivity with large merchants. For example, in 2023, one large merchant received over $20 million for exclusivity commitments.

110. One key mechanism employed is "cliff pricing," where merchants receive favorable rates only if they meet high-volume thresholds (typically 90–100% of eligible transactions). Missing these thresholds, even by 0.01%, triggers punitive rack rates on all transactions. Failures to meet volume commitments can also lead to early termination and clawbacks of previous incentives.

111. Visa also uses credit interchange discounts to win debit routing, meaning that if a merchant fails to meet its volume commitments, it may also pay higher fees on Visa's credit card transactions too.

112. For example, to secure a significant volume of business from Google and thwart competition, Visa offered Google credit incentives. Visa used similar credit incentives with a health food supermarket chain. Accordingly, even large merchants with more negotiating power are prevented from refusing Visa's anticompetitive deals because doing so will mean higher fees on non-contestable debit and credit transactions processed on Visa's network. Notably, many alternative networks, like PIN networks, have no credit businesses thereby further limiting their ability to compete against Visa's bundling and pricing schemes.

113. This structure creates a near-impossible situation for competing networks. To win business, a PIN network must not only offer better per-transaction pricing but also compensate merchants for the penalties Visa would impose on their remaining non-contestable transactions. This often requires offering commercially unrealistic rates, such as zero or negative pricing.

114. Because of the number of transactions that must be processed through Visa's debit network, paying the supracompetitive rack rates offsets any potential savings a merchant might obtain from running transactions through more affordable debit networks. Indeed, to technically compete, many debit networks would have to offer their services completely free for it to make sense for a merchant to pay the supracompetitive prices associated with not accepting Visa's terms.

115. Moreover, some acquirer processors that operate would-be competitor PIN networks have entered into exclusive routing agreements with Visa. To entice these agreements, Visa offers monetary incentives in exchange for volume commitments. These payments also disincentivize the would-be competitor from even trying to compete for additional transactions.

116. These barriers to entry mean Visa faces minimal competition and can impose supracompetitive fees without recourse. In fact, if Visa lowered its fees for everyone regardless of volume commitments, it would lose its leverage over the debit network market. As one Visa executive noted, lowering prices would be problematic because with so many "uncontested" transactions . . . "if you lower the price, there is nothing to put in a routing deal, [and the] merchant gets it by default with no commitment."

117. Visa's pricing strategy of leveraging its market dominance and utilizing its higher fees to protect its monopoly position is particularly virulent because the issuing banks who decide to issue Visa debit cards are not the entities who ultimately pay Visa's anticompetitive fees—that ultimately falls indirectly on consumers, who are largely unaware of the high fees.

118. Beyond its core anticompetitive pricing strategy, Visa leverages additional fee structures to reinforce merchant volume commitments. A prime example is FANF (Fixed Acquirer Network Fee), a monthly fixed charge imposed on merchants through their acquiring banks that exists on top of standard per-transaction fees. Since the 2010 Durbin Amendment, Visa has raised FANF rates twice and coerces merchants to accept Visa's exclusive terms by offering to waive or reduce the monthly fixed fees.

119. Through this comprehensive system of contracts and fee structures, Visa artificially inflates the costs merchants face on Visa transactions if they attempt to route volume through competing debit networks. Rather than competing on merit, Visa employs these various coercive

1  mechanisms and threats to maintain its market dominance and sustain supracompetitive fees while

2  effectively foreclosing meaningful competition.

3      **2.    Visa Leverages Anticompetitive Contracts on Issuing Banks**

4  120. Visa coerces issuing banks' network choices through its contracting practices, despite the

5  Durbin Amendment's requirement for at least one additional non-Visa network on each card.

6  While issuers could enable multiple networks to promote competition, Visa uses its market power

7  to discourage this practice.

8  121. This strategy takes explicit form in some agreements, such as JPMorgan Chase's contract

9  limiting 90% of their Visa-branded debit cards to just one unaffiliated PIN network.

10  122. Similarly, in 2023, Visa contracted with one of its largest debit-issuing fintech debit

11  customers to require that only one unaffiliated network be enabled on all debit cards issued from

12  the issuing banks.

13  123. Visa extends this control through nearly 1,000 issuing contracts featuring volume

14  incentives that effectively discourage multiple network enablement. These agreements typically

15  require issuers to maintain Visa transaction growth parallel to Visa's overall U.S. debit growth,

16  contractually protecting Visa's market dominance.

17  124. Non-compliance with volume requirements triggers substantial penalties, including early

18  termination fees combining a percentage of earned benefits plus multi-million-dollar fixed

19  charges. Further, failure to abide by Visa's volume commitments gives Visa the right to impose

20  penalties across all Visa debit transactions.

21  125. These volume targets specifically discourage enabling additional networks on debit cards,

22  expanding existing networks' transaction capabilities (e.g., PIN-less routing), and adopting

23  alternative payment technologies (like Real Time Payment).

24  126. A 2020 contract between Visa and an issuing bank was specifically designed to prevent

25  competition from PIN-less networks or Real Time Payment by forcing the issuer to dump the

26  networks if too much volume was being diverted away from Visa.

27  127. Visa also uses incremental debit incentive deals to prevent large issuers from enabling

28  PIN-less networks for face-to-face transactions. Smaller issuers rely on their issuer processors to

make network selections, so Visa imposes agreements designed to discourage PIN-less networks from being enabled.

128. Visa's contracts with issuers protect its non-contestable transactions and reinforce the protections created by its contracts with merchants and acquiring banks. Because only enabled networks can be used to complete a transaction, Visa is able to maintain its dominance (processing over 70% of all debit transactions) by preventing issuers (and merchants or acquirers) from enabling additional networks. Indeed, less enabled networks means additional volume, and specifically non-contestable volume, for Visa. This ensures Visa maintains and increases its leverage and market dominance.

129. Visa further strengthens this control by bundling incentives across products, such as offering Debit Processing Services (DPS) discounts to secure issuer routing volume, mirroring its strategy with merchant routing agreements.

### 3. Visa Successfully Undermined the Purpose of the Durbin Amendment and Maintained its Monopoly Power

130. While the Durbin Amendment aimed to increase competition among debit networks and reduce Visa's monopoly power, its impact has been largely ineffective. Although the amendment initially caused a slight decrease in Visa's market share, the company has actually strengthened its market position in the 14 years since the legislation passed.

131. Visa's own internal assessment acknowledges its continued market dominance despite competitors offering more competitive pricing.

132. In the wake of the 2010 Durbin Amendment, several debit networks attempted to challenge Visa's monopolistic position. Visa countered these efforts by weaponizing its control over non-contestable transactions, threatening issuers, merchants, and acquirers with punitive measures if they considered alternative networks. This coerced loyalty has effectively suppressed competition to consumers' detriment.

133. Visa simultaneously pursued an aggressive strategy of securing exclusive routing agreements with key decision-makers in the payment process.

134. Currently, Visa maintains exclusive routing agreements with more than 180 of its largest merchants and acquirers, covering over 75% of Visa's debit volume—approximately 45% of all U.S. debit volume. These agreements effectively prevent meaningful competition due to network effects: issuers, merchants, and acquirers are discouraged from enabling or accepting additional networks due to insufficient scale.

135. When the Federal Reserve issued Regulation II in October 2022 to clarify the Durbin Amendment's provisions, Visa responded with similar tactics. The company preemptively sought to secure additional volume commitments and exclusivity deals, strengthen early termination fees and penalties, and renew existing agreements. This strategy aimed to minimize Regulation II's impact by locking up as much transaction volume as possible, thereby stifling potential competition.

### 4. Visa Forecloses Competition by Creating Artificial Barriers to Entry

136. Visa maintains its market dominance through a powerful two-sided network, controlling relationships with both financial institutions and merchants. Through strategic contracts, Visa creates barriers that prevent new competitors from achieving the scale needed to compete effectively, reinforcing its market position beyond the natural advantages of network effects.

137. On the banking side, Visa's agreements discourage institutions from offering alternative payment networks. This creates a cascade effect: with fewer non-Visa options available through banks, merchants have little incentive to accept alternative networks due to higher costs and limited utility. This effectively blocks new networks from building the necessary scale to compete.

138. Smaller networks face an impossible equation. To attract business, they would need to price their services far below market rates to offset the penalties their potential partners would face from Visa. In many cases, this would require operating at a loss by actually paying partners to use their services.

139. This creates an insurmountable barrier for smaller networks, even though they often offer lower prices and innovative technologies that could benefit the market in a truly competitive environment. The results are stark: despite the Durbin Amendment's passage 14 years ago, PIN

1  networks together process only 11% of U.S. debit transactions and a mere 5% of card-not-present

2  transactions. No single PIN network has achieved even 10% market share.

3      140. The challenge compounds itself through data advantages. Without sufficient transaction

4  volume, smaller networks cannot build robust fraud prevention systems, which require massive

5  data sets to function effectively. Visa acknowledges its ability to maintain market share despite

6  charging premium prices.

7      141. This creates a self-reinforcing cycle. Visa's dominance allows it to capture more non-

8  contestable transactions, further strengthening its market position and deterring competition.

9      142. Visa actively works to maintain these market dynamics. In Spring 2023, a Visa executive

10  noted that less than half of U.S. debit volume was enabled for card-present PIN-less transactions,

11  resulting in limited merchant adoption. The company specifically feared that if a major U.S. issuer

12  enabled card-present PIN-less transactions, it could create a tipping point leading to broader

13  adoption by processors and merchants.

14      143. This concern became particularly acute in 2023 when JPMorgan Chase sought to add

15  Discover's Pulse network to its Visa-branded debit cards, which already featured Mastercard's

16  Maestro as the back-of-card network. Unlike Maestro, Pulse offered both card-present and card-

17  not-present PIN-less functionality. Visa executives worried that if Chase enabled Pulse, a

18  substantial percentage of card-not-present volume would be priced below Visa's rates. They feared

19  this could trigger increased merchant adoption of PIN-less options, increasing competition against

20  Visa.

21      144. In response, Visa took strategic action. Visa granted Chase only a temporary waiver to

22  add Pulse as a second unaffiliated network, but required Chase to sign a new debit routing

23  agreement.

24      145. This exemplifies how Visa leverages its market position to maintain control even when

25  facing regulatory compliance pressures and minimal competition. Such actions continue to

26  reinforce Visa's market dominance, making it increasingly difficult for alternative networks to

27  compete effectively.

28

CLASS ACTION COMPLAINT

**C.    Visa Leverages its Monopoly Power to Foreclose Innovative Alternative Networks**

146. A new wave of financial technology could improve how debit transactions work and reduce costs. These fintech debit networks enable consumers to make purchases directly from their bank accounts without using traditional debit cards. By bypassing conventional payment networks like Visa, these systems offer an alternative payment infrastructure. Digital wallets exemplify this innovation–software applications like Apple Pay, PayPal, and Google Pay that securely store users' banking information for seamless transactions.

147. While these fintech networks have achieved significant adoption in international markets, Visa perceives them as a competitive threat to its U.S. market position. In response, Visa has implemented strategic measures to limit their growth potential in the United States, working to preserve its market dominance and pricing power.

148. Figure 3 below demonstrates how these Fintech networks operate and can replace Visa.

**Figure 3:**



Figure 3

149. Visa has evolved its strategy for handling competitive threats from fintech networks. Rather than relying solely on traditional defensive tactics, Visa has adopted an acquisitive approach—identifying promising fintech competitors and purchasing them outright or enticing them to partner with Visa rather than competing against them.

150. This strategy has proven effective. Despite the growing prevalence of online debit transactions and the success of alternative debit networks in other countries, Visa remains the dominant debit network in the United States. Even emerging fintech platforms predominantly route through Visa's network.

151. The limited success of fintech networks in the U.S. market stems not from natural competition but from Visa's strategic use of its market position. When faced with innovative new technologies, Visa's consistent response has been to acquire or partner with potential competitors rather than compete with them.

152. Furthermore, Visa employs sophisticated profit-sharing arrangements with major merchants. These deals involve sharing monopoly profits in exchange for protective commitments: agreements not to bypass Visa's network (disintermediation protection), promises not to discriminate against or disparage Visa, and future business commitments. Visa internally acknowledges that these arrangements often make little economic sense on their face and serve purposes beyond simple payment routing.

### 1.    Fintech Networks Threaten to Disintermediate Visa's Debit Network

153. Fintech networks represent a comprehensive alternative to Visa's traditional services, capable of handling all core payment functions: authorization, clearing, settlement, payment guarantees, fraud protection, and dispute resolution. As technology advances, these networks pose an increasingly credible competitive threat to Visa's business model.

154. The emergence of real-time payment infrastructure has particularly strengthened fintech networks' competitive position. By leveraging these new payment rails, fintech companies can now offer viable alternatives to Visa's services, especially in the lucrative card-not-present transaction space through direct mobile transfers.

155. These networks are designed to be widely accessible, allowing integration by banks, payment processors, and other financial institutions to create direct connections between banks and merchants. This potential for broad adoption particularly concerns Visa, as these networks could evolve into a widespread alternative that enables direct bank account transfers, potentially making Visa's debit network services obsolete.

156. The payment infrastructure landscape has evolved significantly from traditional Automated Clearing House ("ACH") transfers, which typically require several days for processing and fund availability. Modern innovations include more efficient systems like The Clearing House's RTP network and the Federal Reserve's FedNow service (launched in 2023), both offering instant payment settlement between financial institutions.

157. While digital wallet integration with these real-time payment systems remains limited, their continuing evolution and increasing bank adoption suggests a future where more efficient payment networks could challenge Visa's dominance.

158. Digital wallets operate in two main configurations: staged wallets (like PayPal and CashApp) that store funds directly and allow purchases from that balance, and pass-through wallets (like Apple Pay and Google Pay) that transmit payment information directly to merchants' banks for processing similar to traditional debit transactions.

159. While these wallets face the same two-sided market challenges as traditional debit networks in achieving widespread adoption, they have demonstrated the ability to build successful networks.

160. Visa recognizes the strategic threat these digital wallets present. This concern was particularly heightened when Visa learned of discussions between Apple and a major issuing bank about developing a new debit network that would bypass both Visa and Mastercard entirely.

**2. Visa Leveraged its Monopoly Power to Prevent Disintermediation with Staged Digital Wallets**

161. A Visa executive identified PayPal as the only major entity to successfully disintermediate Visa in the United States. This success was short lived, however, as Visa imposed a massive deal with PayPal in 2016 with its routine carrot-or-stick offer: threatening high fees or a share of the monopoly profits if PayPal diverted its transaction volume back to Visa's network.

162. In the 2000's and into the early 2010's, PayPal began to see success as a form of online payment. In fact, Visa initially welcomed PayPal's success because PayPal customers were using Visa debit cards to pay for their online transactions.

163. Visa's outlook on PayPal turned in 2015, however, after PayPal split from its former owner eBay and began encouraging consumers to pay through their bank accounts rather than with debit or credit cards.

164. PayPal is a staged wallet, and thus consumers preload or transfer funds into their wallets from a linked account. Transactions are then processed using ACH, which offers many of the same benefits of debit networks. These transactions thus threatened Visa's market dominance because they could be processed without Visa as a middleman.

165. While PayPal was encouraging more staged wallet use, many consumers still used their debit cards to process transactions. Visa accordingly threatened to penalize PayPal with high transaction fees unless PayPal agreed to an expansive routing contract. PayPal was ultimately forced to agree, or otherwise absorb the increased fees and potentially lose a vast number of customers who were using Visa branded cards.

166. Visa simultaneously thwarted PayPal's attempts to partner with brick-and-mortar merchants by restricting ACH transactions for all consumers who had Visa-branded cards in their PayPal wallets.

167. While Visa reeled back these restrictions in 2021, it continued to require information sharing, which it uses to monitor PayPal's product performance. Further, Visa restricts consumers' ability to use PayPal's in-store ACH option by requiring them to first scan a merchant's QR code and then connect to PayPal to approve the transaction. These additional steps deter consumers from utilizing PayPal as an in-store Visa alternative.

168. PayPal, like many others, is forced to accept Visa's ongoing demands. Indeed, PayPal entered a new 10-year contract with Visa in 2022 that requires PayPal to route 100% of its Visa-eligible volume to Visa from years four to ten, and includes penalties for failing to convert its co-branded debit cards to Visa, requirements to participate in Visa's programs and services, and preservation of most of Visa's "customer choice" provisions, which give Visa preference over other competitors.

169. Since at least 2016, Visa has used the carrot-and-stick proposal—threatening exorbitant staged wallet fees—to coerce other entities into signing deals. Visa views these fees as, essentially,

a loyalty fee. If the entity behaves, Visa waives the fee. If the entity gets out of line (i.e., potentially disintermediates Visa), Visa imposes substantial fees that make business less profitable.

170. Visa has also entered several contracts with Square that prevent Square from meaningfully competing with Visa, including preventing Square from innovating alternative networks that would threaten Visa's dominance.

171. For example, in 2013, Square launched Square Cash (now known as Cash App) that allows for person-to-person payments. Square wished to avoid additional Visa fees so that it could facilitate these payments with debit cards, but Visa was concerned Square was going to build an ACH option that would threaten Visa's debit volume. To squash this threat, Visa offered to waive its high rack rates in exchange for the right to terminate should Square get out of line (i.e., compete and threaten Visa's dominance). In effect, the contract gave Visa a debit routing commitment and protection from ACH's threat of disintermediation.

172. In 2016, after Square innovated and announced its new product "Cash Drawer," which allowed users to store funds in their Square Cash account, Visa acted quickly to nullify the threat. Specifically, Visa threatened to terminate its agreement with Square, claiming the new product was antithetical to their collective goals. Faced with the threat of substantial fees and penalties, Square rescinded its product and removed the feature. In exchange, Visa did not terminate its contract.

173. In 2021, Square launched Cash App Pay, which allows consumers to purchase directly from merchants with Cash App. Square requested Visa waive the staged wallet fees, but Visa saw the threat Cash App Pay posed towards its business. Following suit, Visa leveraged high fees to nullify the threat, and in 2023 Square agreed to send 97% of Cash App Pay transactions over Visa's network. The agreement also required Cash App Pay to prefer Visa in the signup process and not encourage ACH.

### 3.    Visa Pays-Off Potential Competitors with Monopoly Profits to Prevent Competition

174. Visa's market power extends beyond staged wallet providers to potential competitors across the tech industry. Many major technology companies, including Google and Apple, are

already Visa customers, allowing Visa to deploy its standard toolkit of high rates, fees, and penalties to maintain control. When necessary, Visa is willing to share its above-market profits to prevent competition and maintain its profitable position.

175. For the most influential players, Visa crafts specialized agreements that pair incentives on Visa-eligible transactions with commitments not to compete or bypass Visa's network–effectively creating horizontal market divisions. Visa internally acknowledges that these arrangements, such as those with Amazon and Apple, often serve purposes beyond simple payment routing. Despite sometimes accepting lower profits than worst-case scenarios might yield, Visa views these agreements as worthwhile investments in protecting its long-term ability to maintain premium pricing. This strategy has successfully kept major tech companies' debit transactions within Visa's network.

176. Visa's relationship with Apple particularly demonstrates this approach. Apple has committed to avoid developing or launching payment products that might compete with Visa, including features that would use non-Visa processes. The agreement prohibits Apple from promoting non-Visa cards or creating ways to bypass Visa's network. In return, Visa shares substantial profits with Apple–paying hundreds of millions of dollars in 2023 alone. Visa also reduces Apple's merchant fees in exchange for commitments not to direct customers toward alternative payment methods like ACH or introduce competing payment solutions. This arrangement ensures Apple's continued use of Visa's network while preventing Apple from becoming a competitor.

177. In 2022, Visa's concerns about this relationship intensified as Apple began developing new capabilities in the traditional debit network market. Recognizing Apple Pay's potential to fundamentally challenge Visa's market position, Visa chose to strengthen its partnership through increased financial incentives and payments, ensuring Apple would remain a partner rather than emerge as a true competitor.

## III. Anticompetitive Effects

178. Visa has maintained its monopoly and market dominance through years of anticompetitive and unlawful behavior, including imposing exclusionary and anticompetitive

1  contracts on issuers, acquirers, merchants, would-be competitors, and other industry participants
2  by leveraging its non-contestable transactions, high rack rates, penalties, and fees. Visa's conduct
3  prevents competition for transactions that would otherwise be contested and stymies competition
4  for non-contestable transactions before it can arise.

5      179. But for Visa's conduct, PIN networks, Fintech networks, and other entities would have
6  the opportunity to gain the necessary scale to meaningfully compete for transactions on the merits.
7  This would mean significantly lower prices, more choices and superior features. Visa's conduct,
8  however, has foreclosed meaningful competition from current and would-be competitors, thereby
9  causing higher fees and inferior services.

10     180. Visa's stranglehold further entrenches its monopoly power, creating more non-
11 contestable transactions and thereby increasing Visa's dominance and leverage. Visa's volume
12 commitments restrict competitors from attaining the necessary scale. Without the necessary scale,
13 potential competitors are unable to compete on price or quality. Further, Visa's commitments
14 severely punish disloyalty, which effectively prevents merchants from ever being able to use
15 another network service. Indeed, rival networks receive less volume if they reduce prices or
16 develop new features or services. As a result, competitors and/or potential competitors are
17 artificially capped by Visa, thereby protecting Visa's power and solidifying otherwise contestable
18 transactions as its own.

19     181. Visa's leverage also punishes innovation, restricting the volume that rival networks
20 receive or outright punishing them if they attempt to develop networks or network alternatives that
21 could threaten Visa's dominance. As a result, innovation that would have otherwise benefitted
22 consumers is hindered, and Visa has no motivation to innovate. Indeed, Visa itself admits that it
23 has not significantly invested in innovation over the past decade aside from tokenization.

24     182. To be sure, the success of Visa's anticompetitive conduct is reflected in its control of the
25 market. By the end of 2022, Visa calculated that at least 75% of all its debit volume, and 80% of
26 its card-not-present debit volume, were insulated from competition. Moreover, Visa's routing
27 agreements with merchants and acquirers alone foreclose 45% of all United States debit volume;
28 this figure is even higher for card-not-present transactions.

183. At the expense of consumers, Visa has taken affirmative, intentional efforts to constrain the vigorous competition that would act as a check on its prices and stimulate innovation. Competition, not Visa, should control how consumers, merchants, and their respective banks interact. Competition, not Visa, should govern innovation in the debit network marketplace. Most importantly, competition, not Visa, should set the fees charged for network services, of which consumers bear the highest burden.

184. To be sure, network fees are one of the highest costs of doing business for merchants. Oftentimes, network fees are a merchants' third biggest expenses behind only labor and rent. Swipe fees, thus, must be passed onto consumers.

185. It is well-known and recognized by merchants, the Department of Justice, and others that network fees are passed onto consumers. Indeed, for many merchants, such as convenience stores, grocers, and other food retailers, margins are in the single digits. These margins are around or below the level of debit network fees the businesses must pay; thus, merchants must pass on their debit network fees to consumers or else go out of business.

186. Consumers are unable to avoid this pass-through. Every time a consumer makes a purchase, whether by debit, credit, or cash, they are subsidizing the supracompetitive network fees imposed by Visa.

**IV.    No Countervailing Factors**

187. Visa's exclusionary, unlawful, and anticompetitive behavior lacks any legitimate, procompetitive advantages that could outweigh the harm it inflicts on competition. Nor are there benefits that could not be realized through less restrictive means. The anticompetitive clauses in Visa's contracts and related actions are not essential to safeguard its technology, promote customer expansion, deter free-riding, or accomplish any other purported advantage. Visa could pursue any valid procompetitive goals without resorting to the restrictive terms being contested in this case; in fact, less restrictive methods are available to Visa to achieve those goals. Further, Visa's agreements with existing and potential direct competitors do not function as mere adjuncts to its vertical relationships; instead, they act as clear divisions within the relevant markets among direct competitors.

## V.    Relevant U.S. Debit Markets

188. Courts define a relevant market, which has both a geographic and product market dimension, to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services, and markets need not have strict boundaries.

189. Here, there are two relevant markets: (1) the market for general purpose debit network services within the United States, and (2) the narrower, card-not-present debit network services market, which is subsumed by the former.

### A.    The United States is a Relevant Geographic Market

190. The United States is a relevant geographic market. Federal laws and regulations governing debit transactions, including card-not-present transactions, operate on a nationwide level. Visa structures its U.S. debit network services market accordingly, as seen in its distinct rules for merchant acceptance in the U.S. and its unique pricing for debit services, including card-not-present transactions, tailored for merchants, acquirers, and issuers in the country. Network services outside the United States are not viable alternatives to the primary market participants, including consumers, issuers, acquirers, and merchants. As a result, a company serving as the sole provider of general purpose debit network services or card-not-present debit network services within the United States would have the power to sustain prices above those typical in a competitive market.

### B.    Relevant Product Markets

191. The two relevant product markets are: (1) the general purpose debit network services market, and (2) the general purpose card-not-present debit network services market.

#### 1.    General Purpose Debit Network Services Market

192. General purpose debit network services are products and services that facilitate the debit and transfer of consumers' bank account funds, typically using a credential or other account number to identify the consumer. Visa and other fintech debit competitors provide products and services that are inputs to and that enable debit transactions. They compete to provide debit network services for general purposes, meaning that their debit credentials are accepted at

1  numerous, unrelated merchants. Debit network providers, such as Visa, sell their services to both

2  issuers and acquirers, or in the case of some alternative debit networks, to consumers and

3  merchants. Debit network providers serve as the intermediary, or middlemen, between consumers

4  and merchants, operating two-sided transaction platforms that facilitate the transactions between

5  consumers and merchants, and their respective banks. These services represent a relevant product

6  market.

7  193. Debit networks, like Visa, provide a host of services that enable debit transactions;

8  collectively, these services constitute a market that is jointly used by consumers and merchants,

9  and their respective banks. These services include the ability for the consumer to dispute and

10  chargeback a transaction; payment guarantees for merchants; fraud protection; as well as the "rail"

11  or methods the parties to a transaction use to communicate and facilitate the debit and transfer of

12  a consumer's funds to the merchant. These minimum attributes of debit are important to

13  consumers, merchants, and their respective banks alike and distinguish debit transactions from

14  other methods of payment. While consumers do not contract directly with Visa, consumers (and

15  their respective banks) rely on Visa and other networks to make it possible for them to purchase

16  goods and services.

17  194. Debit networks are a two-sided platform that exhibit a high degree of interdependency

18  between consumers (and the issuing banks) on one side, and merchants (and the acquiring banks)

19  on the other. Consumers get more value from a network that connects to more merchants because

20  that increases whom and where they may purchase goods and services from. Likewise, merchants

21  get more value from a network that connects to more consumers because that increases the number

22  of persons they may sell their goods and services to.

23  195. General purpose debit network services are a relevant product market under the antitrust

24  laws. Consumers would not find other payment services to be a viable alternative to debit. As a

25  result, issuing banks do not consider alternative payment services to be a viable alternative to debit

26  because consumers value debit; merchants do not consider alternative payment services to be a

27  viable alternative because they do not want to lose sales by not accepting consumers' preferred

28  payment methods; and acquiring banks do not consider alternative payment services to be a viable

1   alternative because they do not want to lose their business with merchants. Thus, there are not

2   reasonable substitutes for general purpose debit network services, and a firm that was the only

3   seller of general purpose debit network services would be able to maintain prices above the level

4   that would prevail in a competitive market.

5       196.  The general purpose debit network services market includes the services sold by debit

6   networks other than traditional debit card networks. For example, fintech debit networks can be

7   accepted by all merchants that participate in the network and provide payment guarantees,

8   chargeback and dispute services, and fraud protection. While debit transactions facilitated by

9   fintech networks do not include a debit card issued to a consumer, the services provided by fintech

10  networks are functionally equivalent to consumers and merchants.

11      197. General purpose credit card network services are not a reasonable alternative or

12  interchangeable with debit network services because debit transactions withdraw funds direct from

13  the consumer's account, unlike credit transactions that draw from a line of credit. Visa described

14  debit as "pay now" product, and credit as a "pay later" product. The distinction between the two

15  forms of payment is widely recognized and accepted in the industry. Indeed, Visa and other

16  debit/credit networks offer different pricing for debit and credit transactions. Further, regulations,

17  such as the Durbin Amendment's limitations of issuer transaction fees do not apply to credit. Many

18  consumers either do not qualify for credit cards or strongly prefer using their existing funds over

19  incurring debt, making issuers unlikely to substitute credit for debit.

20          **2.    General Purposes Card-Not-Present Network Services Market**

21      198. While general purpose debit network services cover all debit transactions, narrow

22  submarkets within this category exist. One such submarket, recognized by Visa itself, is the general

23  purpose card-not-present debit network services market, which primarily relates to e-commerce.

24      199. This market includes both traditional debit card and fintech debit transactions, enabling

25  consumers to pay various merchants for goods and services directly from their bank account.

26      200. General purpose card-not-present debit network services is a relevant product market

27  under the antitrust laws. Market participants do not find other payment services to be a reasonable

28  substitute for card-not-present debit. To be sure, there are particularly few even potential

alternatives to card-not-present debit transactions, given that cash is not an option for online, e-commerce, or other card-not-present situations. There are not reasonable substitutes for card-not-present debit transactions. A firm that was the only provider of general purpose card-not-present debit network services could raise and maintain prices above the level that would apply in a competitive market.

## VI.    Visa Has Monopoly Power in the U.S. Debit Markets

201. Visa holds a monopolistic position in the general purpose debit network services market and the general purpose card-not-present network services market in the United States, with market shares exceeding 60% and 65%, respectively, based on payment volume. The next largest debit provider, Mastercard, pales in comparison with less than 25% of the payment volume in either market. No other network services provider for either market captures more than a single-digit percentage of debit volume.

202. Visa's monopoly power in the relevant debit markets stems from its ability to manipulate prices and suppress competition.

203. Visa has maintained its monopoly-level pricing, as evidenced by its exceptionally high profit margins. Visa's operating margins in North America are 83%, which is driven primarily by its United States debit business. Visa's profit margins substantially exceed most other publicly-traded companies and are a major increase since Visa initially went public in 2007.

204. Visa has effectively blocked competition in both debit markets, as evidenced by its consistently high market shares and despite regulatory shifts. While Visa saw a brief market share reduction in 2011 (to 63%) and 2012 (to 56%) immediately following the passing and implementation of the Durbin Amendment, Visa's countermeasures ensured it quickly rebounded, and Visa has consistently grown its market share over the past decade. For example, in preparation for the Durbin Amendment going into effect, Visa started signing contracts with merchants and acquirers, ensuring that almost all of their Visa-eligible volume would be routed to Visa. Since the Durbin Amendment, Visa has used similar tactics, as well as other strategies like leveraging its market share and threatening fees and penalties to maintain, protect, and build its empire.

205. Despite recent clarifications from the Federal Reserve under Regulation II, requiring issuing banks to enable at least one back-of-card network unaffiliated with the front-of-card network for card-not-present transactions, Visa's market share was unaffected.

206. In addition to high profit margins and sustained market share, other factors confirm Visa's monopoly power in the relevant debit markets.

207. In contrast with smaller PIN networks, Visa and Mastercard are accepted by nearly every U.S. merchant that processes debit payments, regardless of whether the majority of their revenue comes from card-present or card-not-present transactions. No matter which debit cards consumers use, merchants consider both Visa and Mastercard indispensable and accept both networks to maximize their sales opportunities. Visa accordingly has significant leverage over merchants; merchant cannot simply abandon Visa when faced with price hikes or unfavorable terms. Instead, they must accept them and cover the additional costs by raising the prices consumers pay for their goods and services. Additionally, debit networks face barriers to entering and growing their business in the market, including regulation and brand recognition.

208. Merchants and acquiring banks are more inclined to absorb and pass-on the costs of enabling and complying with networks that handle a large enough volume to justify the costs. Losing some potential sales because of price hikes is preferred over losing an entire population of consumers who rely on Visa-branded debit cards to make their purchases. Likewise, issuers prefer to enable networks widely accepted by merchants because that increases consumers' options and makes their bank more appealing. Visa knows that smaller, rival networks lack the necessary scale on both sides of the market. The market's two-sided structure makes it difficult to gain widespread enablement without already having broad acceptance, creating the network effects feedback loop outlined above. This network effects is a significant barrier to entry and growth in the market.

209. Issuing banks typically offer only one front-of-card network, which usually includes a long-term contract with the network provider (most commonly Visa, but also Mastercard). Issuing banks rarely switch front-of-card networks because the process is costly, difficult, and can cause a negative consumer experience. This further solidifies Visa's dominance, limiting Mastercard's

and other potential front-of-card network competitors from entering, expanding, or competing in the market.

210. Visa recognizes and exploits these barriers, including switching costs and network effects, to retain its market dominance and stifle would-be competitors that could disrupt their monopolistic position. For example, in 2023, Visa threatened issuers with financial penalties if they enabled new features from competing PIN networks that led to a reduction in Visa's debit network volume. Around this time, Federal Reserve regulations required issuers to enable at least two unaffiliated networks for card-not-present transactions. Previously, issuers had relied solely on the front-of-card network (e.g., Visa) to process these transactions. In response to the threat of merchants and acquiring banks adopting their rivals' PIN-less capabilities, Visa urged – with an accompanying clarification that the failure to listen would result in higher fees and penalties – issuing banks to disable PIN-less functions for card-present transactions. These penalties would act as an indirect price increase for issuers, one they could not easily avoid due to the costs associated with switching front-of-card network. This tactic allows Visa to expand the volume of non-contestable transactions, furthering its leverage over market participants.

211. Visa has the power to set prices without concern over actual costs. Further, Visa engages in price discrimination across different industry sectors, offering pricing differences unrelated to the costs of providing services.

212. Visa has also been able to introduce new, less favorable pricing models without losing debit volume. For example, in 2012, Visa launched its monthly FANF across all merchants and acquirers. Similarly, in October 2023, Visa implemented a mandatory Digital Commerce Service fee, which combined several previously optional value-added service fees into one for card-not-present transactions. Visa projects roughly a five-times boost in network revenue from this mandatory fee in contrast to the revenue earned from the previously optional fees. Despite a major price increase on merchants and acquirers, Visa anticipated no impact on its debit volume. Merchants, and particularly those with narrow margins, were resultantly forced to roll these new fees into their prices for goods and services. In other words, consumers paid the price of the fee hikes.

## VII.    Class Allegations

213. Plaintiff brings this action individually and on behalf of all other similarly situated persons under Federal Rule of Civil Procedure 23(a) and (b)(2), as representatives of a Class of indirect purchasers seeking injunctive relief ("Injunctive Relief Class") defined as follows:

> Any person in the United States who purchased goods or services with a general purpose Visa-Branded Debit Card[4] during the period from the applicable limitations period through the present and indirectly paid Visa network fees.

214. Plaintiff brings this action individually and on behalf of all others similarly situated persons under Federal Rule of Civil Procedure 23(a), (b)(3), and/or (c)(5) as representatives of a Class seeking damages for violations of state antitrust and consumer protection laws ("State Law Damages Class"), defined as follows:

> Any person in the United States who purchased goods or services for personal, family, or household purposes with a general purpose Visa-Branded Debit Card during the Class Period in Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.[5]

215. The Classes are so numerous that joinder of all members would be impracticable. While the exact number of Class members is unknown, given the commerce at issue, the prevalence of Visa debit cards, and Visa's significant market share, there are likely millions of Class Members.

216. Plaintiff's claims are typical of those of the Classes.

---

[4] "Visa-Branded Debit Card" means a Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by Visa, or that is issued under any such brand or mark. "Debit Card" means any card, plate, or other payment code, device, credential, account, or service, even when no physical card is issued that is used for one or multiple transactions – including, without limitation, a plastic card, a mobile phone or other mobile communications device, a fob, a home assistant or other internet-connected device, or any other current or future code, device, credential, account, or service by which a person can pay for goods or services – that is issued or approved for use through a payment network to debit an asset or deposit account, or that otherwise is not a Credit Card, regardless of whether authentication is based on signature, PIN, or other such means (or no means at all), and regardless of whether or not the issuer holds the account (such as decoupled debit).

[5] For purposes of defining the Class Period for the State Law Damages Class, the Class Period will extend back to the relevant statute of limitation period for the respective state law claim plus tolling where applicable.

217. Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiff are in accordance with those of the Classes.

218. Questions of law and fact common to the members of the Classes will prevail over questions, should they arise, that may be specific to individual Class members because Visa has acted on grounds generally applicable to the Classes.

219. Questions of law and fact common to the Classes include, but are not limited to:

    a. Whether Visa intentionally and unlawfully impaired or impeded competition in the relevant market;

    b. Whether Visa maintained or enhanced monopoly power in the relevant market;

    c. Whether Visa engaged in anticompetitive conduct in order to disadvantage competitors and dissuade competition to maintain monopoly power in the relevant market;

    d. Whether Visa had monopoly power in the relevant market;

    e. Whether Visa had procompetitive reasons for its conduct;

    f. The effects of Visa's anticompetitive conduct on network fees, interchange fees, and retail prices;

    g. Whether Plaintiff and class members have been overcharged and thus damages as a result of Visa's unlawful behavior;

    h. The appropriate declaratory and injunctive relief for the Classes; and

    i. The proper measure of damages.

220. Class action treatment is superior to individual actions and the fair and efficient adjudication of the controversy because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the need for unnecessary duplicative efforts and expenses. The benefits of proceeding as a class action, including providing injured persons with a method for obtaining relief for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in connection with managing this class action.

221. Plaintiff knows of no difficulty to be encountered in the maintenance of this action as a class action.

## CAUSES OF ACTION

### COUNT I: INJUNCTIVE RELIEF

**For Violations of the Sherman Act, 15 U.S.C. § 1 & 2**
**(On Behalf of the Nationwide Injunctive Relief Class)**

222. Plaintiff incorporates each prior paragraph as if set forth herein.

223. With respect to the two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services, Visa has engaged in a continuing scheme with the purpose and effect of acquiring, enhancing, and maintaining monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and has entered into unlawful agreements in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

224. As a material and proximate result of Visa's unlawful conduct, Plaintiff suffered injury to their property. These injuries include, but are not limited to, paying Visa's supracompetitive network fees that were passed through into the prices of goods and services. Plaintiff was also deprived of the benefits of free and open competition.

225. Plaintiff is threatened with future injury to their property unless Defendants are enjoined from further unlawful conduct.

226. Plaintiff accordingly seeks equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects for not continue or reoccur in the future.

**COUNT II: VIOLATIONS OF STATE ANTITRUST LAWS**

**(On Behalf of the State Law Damages Class)**

227. Plaintiff incorporates each prior paragraph as if set forth herein.

228. In addition to violating Section 2 of the Sherman Act, Visa intentionally and wrongfully maintained, attempted to maintain, and/or conspired to maintain monopoly power in the relevant markets.

229. By engaging in the foregoing conduct, Visa intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in the violation of the following state antitrust laws:

a. Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of goods and services in Arizona by Class members and/or Arizona residents.

b. Ark. Code Ann. §§ 4-75-208, *et seq.*, with respect to purchases of goods and services in Arkansas by Class members and/or Arkansas residents.

c. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases of goods and services in California by Class members and/or California residents.

d. D.C. Code §§ 28-4501, *et seq.*, with respect to purchases of goods and services in the District of Columbia by Class members and/or District of Columbia residents.

e. Haw. Rev. Stat §§ 480-1, *et seq.*, with respect to purchases of goods and services in Hawaii by Class members and/or Hawaii residents.

f. 740 Ill. Comp. Stat. Ann. 10/3(1), *et. seq.*, with respect to purchases of goods and services in Illinois by Class members and/or Illinois residents.

g. Iowa Code §§ 553.1, *et seq.*, with respect to purchases of goods and services in Iowa by Class members and/or Iowa residents.

h. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of goods and services in Kansas by Class members and/or Kansas residents.

i. Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*, with respect to purchases of goods and services in Maine by Class members and/or Maine residents.

j. Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of goods and services in Michigan by Class members and/or Michigan residents.

k. Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of goods and services in Minnesota by Class members and/or Minnesota residents.

l. Miss. Code Ann. §§ 74-21-1, *et seq.*, with respect to purchases of goods and services in Mississippi by Class members and/or Mississippi residents.

m. Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of goods and services in Nebraska by Class members and/or Nebraska residents

n. Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of goods and services in Nevada by Class members and/or Nevada residents.

o. N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et seq.*, with respect to purchases of goods and services in New Hampshire by Class members and/or New Hampshire residents.

p. N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of goods and services in New Mexico by Class members and/or New Mexico residents.

q. N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of goods and services in New York by Class members and/or New York residents.

r. N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of goods and services in North Carolina by Class members and/or North Carolina residents.

s.  N.D. Cent. Code §§ 51-08.1, *et seq.*, with respect to purchases of goods and services in North Dakota by Class members and/or North Dakota residents.

t.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of goods and services in Oregon by Class members and/or Oregon residents.

u.  R.I. Gen Laws §§ 6-36-1, *et seq.*, with respect to purchases of goods and services in Rhode Island by Class members and/or Rhode Island residents.

v.  S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of goods and services in South Dakota by Class members and/or South Dakota residents.

w.  Tenn. Code §§ 47-25-101, *et seq.*, with respect to purchases of goods and services in Tennessee by Class members and/or Tennessee residents.

x.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of goods and services in Utah by Class members and/or Utah residents.

y.  W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of goods and services in West Virginia by Class members and/or West Virginia residents.

z.  Wis. Stat. Ann. §§ 133.01(1), *et seq.*, with respect to purchases of goods and services in Wisconsin by Class members and/or Wisconsin residents

230. Plaintiff and Class members seek damages as permitted by law for their injuries caused by Visa's violations of the respective statutes.

**COUNT III: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

**(On Behalf of State Law Damages Class)**

231. Plaintiff incorporates each prior paragraph as if set forth herein.

232. By engaging in the unfair and unlawful conduct alleged herein with respect to purchases in the below respective States and/or purchases made by residents of the below States, Visa violated the following state consumer protection laws:

a.  Ariz. Rev. Stat. §§ 44-1521, et seq., with respect to purchases of goods or services with a Visa debit card in Arizona by Class members and/or Arizona residents.

b.  Ark. Code §§ 4-88-101, et seq., with respect to purchases of goods or services with a Visa debit card in Arkansas by Class members and/or Arkansas residents.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases of goods or services with a Visa debit card in California by Class members and/or California residents.

d.  Colo. Rev. Stat. §§ 6-1-101, et seq., with respect to purchases of goods or services with a Visa debit card in Colorado by Class members and/or Colorado residents.

e.  D.C. Code §§ 28-3901, et seq., with respect to purchases of goods or services with a Visa debit card in the District of Columbia by Class members and/or District of Columbia residents.

f.  Fla. Stat. §§ 501.201, et seq., with respect to purchases of goods or services with a Visa debit card in Florida by Class members and/or Florida residents.

g.  Haw. Rev. Stat. §§ 481-1, et seq., with respect to purchases of goods or services with a Visa debit card in Hawaii by Class members and/or Hawaii residents.

h.  Idaho Code Ann. §§ 48-601, et seq., with respect to purchases of goods or services with a Visa debit card in Idaho by Class members and/or Idaho residents.

i.  815 Ill. Comp. Stat. Ann. 505/1, et seq., with respect to purchases of goods or services with a Visa debit card in Illinois by Class members and/or Illinois residents.

j.  Kan. Stat. Ann. §§ 50-623, et seq., with respect to purchases of goods or services with a Visa debit card in Kansas by Class members and/or Kansas residents.

k.  Me. Stat. Tit. 5, §§ 205-A, et seq., with respect to purchases of goods or services with a Visa debit card in Maine by Class members and/or Maine residents.

l.  Mass. Gen. Laws Ch. 93A §§ 1, et seq., with respect to purchases of goods or services with a Visa debit card in Massachusetts by Class members and/or Massachusetts residents.

m.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases of goods or services with a Visa debit card in Minnesota by Class members and/or Minnesota residents.

n.  Mo. Rev. Stat. §§ 407.010, et seq., with respect to purchases of goods or services with a Visa debit card in Missouri by Class members and/or Missouri residents.

o.  Mont. Code §§ 30-14-103, et seq., and Mont. Code §§ 30-14-201, et seq., with respect to purchases of goods or services with a Visa debit card in Montana by Class members and/or Montana residents.

p.  Neb. Rev. Stat. §§ 59-1602, et seq., with respect to purchases of goods or services with a Visa debit card in Nebraska by Class members and/or Nebraska residents.

q.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases of goods or services with a Visa debit card in Nevada by Class members and/or Nevada residents.

r.  N.M. Stat. Ann. §§ 57-12-1, et seq., with respect to purchases of goods or services with a Visa debit card in New Mexico by Class members and/or New Mexico residents.

s.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases of goods or services with a Visa debit card in New York by Class members and/or New York residents.

t.  N.C. Gen. Stat. §§ 75-1.1, et seq., with respect to purchases of goods or services with a Visa debit card in North Carolina by Class members and/or North Carolina residents.

u.  N.D. Cent. Code §§ 51-10, et seq., with respect to purchases of goods or services with a Visa debit card in North Dakota by Class members and/or North Dakota residents.

v.  R.I. Gen. Laws 6-13.1-1, et seq., with respect to purchases of goods or services with a Visa debit card in Rhode Island by Class members and/or Rhode Island residents

w.  S.C. Code Ann. §§ 39-5-10, et seq., with respect to purchases of goods or services with a Visa debit card in South Carolina by Class members and/or South Carolina residents.

x.  Tenn. Code Ann. §§ 47-18-101, et seq., with respect to purchases of goods or services with a Visa debit card in Tennessee by Class members and/or Tennessee residents.

y.  Utah Code Ann. §§ 13-11-1, et seq., with respect to purchases of goods or services with a Visa debit card in Utah by Class members and/or Utah residents.

z.  Vt. Stat. Ann. Tit. 9, §§ 2453, et seq., with respect to purchases of goods or services with a Visa debit card in Vermont by Class members and/or Vermont residents.

aa. W. Va. Code §§ 46A-6-101, et seq., with respect to purchases of goods or services with a Visa debit card in West Virginia by Class members and/or West Virginia residents.

bb. Wis. Stat. §§ 100.20, et seq., with respect to purchases of goods or services with a Visa debit card in Wisconsin by Class members and/or Wisconsin residents.

233. On behalf of themselves and the State Law Damages Class, Plaintiff seeks all appropriate relief provided for under the above states.

## RELIEF SOUGHT

234. Plaintiff requests judgment including the following relief:

a.  A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel of records as Class Counsel.

b. Permanent injunctive relief invaliding Visa's exclusivity, routing, volume commitments, and any other anticompetitive agreements with issuers, merchants, and acquirers.

c. Damages under the relevant state antitrust and/or consumer protection statutes for Visa's wrongful conduct as alleged herein.

d. Plaintiff's and the Classes' costs, expenses, and reasonable attorneys' fees.

e. Such other relief in equity or at law as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury.

Dated: December 10, 2024

By:     */s/ Christopher J. Hydal*
Christopher J. Hydal

Joseph R. Saveri (*pro hac vice* pending)
Cadio Zirpoli (*pro hac vice* pending)
David H. Seidel (*pro hac vice* pending)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
dseidel@saverilawfirm.com

Christopher J. Hydal (SBN 5670492)
**JOSEPH SAVERI LAW FIRM, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone:     (646) 527-7310
Facsimile:     (212) 202-7678
Email:          chydal@saverilawfirm.com

*Attorneys for Plaintiff*